UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
EMILIO L. VOZZOLO, on behalf of himself
and all others similarly situated,

                  Plaintiff,

v.

AIR CANADA,
              Defendant.
--------------------------------------------------------X

**MEMORANDUM**
**OPINION AND ORDER**

20-CV-03503 (PMH)

Rel. 20-CV-04988 (PMH)
20-CV-11037 (PMH)

PHILIP M. HALPERN, United States District Judge:

Emilio L. Vozzolo, Thomas Piercy, and Barry Winograd ("Plaintiffs") commenced these consolidated[1] putative class actions on behalf of themselves and others similarly situated, seeking refunds from Air Canada ("Defendant") for airline tickets purchased for flights that were cancelled as a result of the COVID-19 pandemic. (Doc. 1).[2] More than one year following the onset of the pandemic, on or about April 13, 2021, Defendant began a program in which it offered refunds to customers holding otherwise non-refundable or partially refundable tickets whose flights were cancelled for any reason from March 1, 2020 to present (the "Refund Offer"). (*See* Doc. 62). Plaintiffs now seek a preliminary injunction directing Defendant to set aside a portion of any yet-to-be paid refunds to the putative class for attorney's fees, pending a determination of whether Plaintiffs' suits were a substantial cause of the Refund Offer.

For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is GRANTED.

---

[1] On April 30, 2021, the Court issued an order under Federal Rule of Civil Procedure 42(a)(2), consolidating the actions entitled *Piercy v. Air Canada* ("*Piercy*"), No. 20-CV-04988, and *Winograd v. Air Canada* ("*Winograd*"), No. 20-CV-11037, into *Vozzolo v. Air Canada* ("*Vozzolo*"), No. 20-CV-03503.

[2] Unless otherwise indicated, the Court's citations to "Doc." refer to the docket entries on the *Vozzolo* ECF docket.

**BACKGROUND**

The COVID-19 pandemic needs no introduction. It has been a widespread and devastating event that has had and continues to have a profound impact on individuals and industries across the globe. This case involves the pandemic's effects on a carrier in the aviation industry. It was was brought by and on behalf of individuals who were set to travel somewhere on Air Canada flights in early 2020. The Air Canada flights were cancelled due to COVID-19 and these customers did not receive a refund for the price paid for their tickets.

Travel restrictions affecting domestic and international air travel began on January 31, 2020, leading to "do-not-travel" warnings and bans and the closure of borders—all of these restrictions were imposed in an effort to combat the COVID-19 pandemic. (Doc. 1 ¶¶ 22-23). Defendant began cancelling flights in March 2020 because of the travel restrictions. (*Id*. ¶¶ 24-25). Plaintiffs, who had purchased tickets for flights on March 31, 2020, April 2, 2020, April 29, 2020, and April 30, 2020, were advised by Defendant that their flights had been cancelled. (*Id*. ¶ 10-11; *Piercy* Doc. 1 ¶¶ 25-27; *Winograd* Doc. 37 ¶¶ 86-87). Instead of offering or issuing a full refund for these cancelled flights, Defendant advised Plaintiffs and other passengers that they were entitled only to a travel voucher to be used within a certain amount of time. (Doc. 1 ¶ 11; *Piercy* Doc. 1 ¶ 28; *Winograd* Doc. 37 ¶¶ 87-89).

Because of Defendant's refusal to provide passengers with full refunds, litigation soon materialized: on March 20, 2020, a putative class action was commenced against Defendant and other airlines entitled *Lachaine vs. Transat et al.*, in the Superior Court of Quebec, Montreal District, Docket Number 500-06-001052-204. (Doc. 65, "Passeri Decl." ¶ 13). The plaintiffs in *Lachaine* sought to certify three separate classes, including one comprised of U.S. residents, who held a ticket for an Air Canada flight that was cancelled due to COVID-19 and who were not

provided a refund. (*Id*.). On March 23, 2020, a putative class action was commenced against Defendant in the Middle District of Florida, Orlando Division, entitled *Levu v. Air Canada, Inc*., Case No. 6:20-CV-00703. (*Id*. ¶ 11). On March 27, 2020, another putative class action was commenced in Canada against Defendant and others, entitled *Donaldson vs. Swoop et al.*, Docket Number T-428-20, seeking to certify a class of individuals residing "anywhere in the world" who had a confirmed booking on Air Canada before March 11, 2020. (*Id*. ¶ 13). Also on March 27, 2020, a third putative class action was filed in Canada similarly seeking to represent "all persons anywhere in the world" who contracted with Defendant for flights from March 13, 2020 onward, that were cancelled and not issued a refund. (*Id*.). In addition to these class actions filed in the United States and Canada, the U.S. Department of Transportation ("DOT") communicated with Defendant concerning thousands of consumer complaints seeking refunds for their cancelled flights, the DOT's requirements that both domestic and foreign airlines refund tickets for flights cancelled due to COVID-19, and threatened enforcement action against Defendant. (*Id*. ¶ 12; Doc. 1 ¶ 34; Doc. 57, "Kravec Decl." Ex. F).

As of April 8, 2020, the United States Government had given the domestic aviation industry a $50 billion bailout (Passeri Decl. ¶ 8), and as of April 30, 2020, the European Governments announced the first € 26 billion bailout to their carriers (*id*. ¶ 9). Defendant, however, had not been provided similar government-relief packages at that time. (*Id*. ¶¶ 3, 5, 7).

On May 4, 2020, Defendant noted in its First Quarter 2020 Management's Discussion and Analysis of Results of Operations and Financial Condition that "[n]ot refunding non-refundable tickets may expose Air Canada to litigation, including class actions, as well as enforcement action by regulators in certain jurisdictions." (Kravec Decl. Ex. A at 26). Three putative class actions had already been commenced against Defendant in Canada, one had been commenced in the United

States, and the DOT was threatening enforcement action.

The following day, on May 5, 2020, the *Vozzolo* putative class action was commenced. (Doc. 1). The next week the DOT issued an enforcement notice dated May 12, 2020, again threatening enforcement action against Defendant. (Kravec Decl. Ex. G). On May 26, 2020, a fourth putative class action was filed in Canada entitled *Genest vs. Air Canada et al*., Docket Number 200-06-000248-206, seeking to represent a class comprised of any person who purchased a ticket for an Air Canada flight prior to March 19, 2020. (Passeri Decl. ¶ 13). On June 29, 2020, the *Piercy* putative class action was commenced. (*Piercy* Doc. 1).

On July 24, 2020, the DOT sent a letter to Defendant setting forth its position that Air Canada's practice of not offering a refund to a ticketed passenger when the carrier cancels or significantly changes the passenger's flight constitutes an unfair practice.[3] (Kravec Decl. Ex. G). The same day, July 24, 2020, a fifth putative class action was filed in Canada entitled *Jaswall vs. Air Canada et al.*, Docket Number S-207356, seeking to represent a class of Canadian residents who held tickets to travel on or after March 1, 2020 and who did not receive a refund for flight cancellation. On August 12, 2020, the *Winograd* action was initially filed in Superior Court for the State of California, County of Alameda. (*Winograd* Doc. 1).

On April 12, 2021, more than one year following the onset of the pandemic, Defendant announced that it had entered into a series of debt and equity financing agreements with the Canadian Government whereby Defendant agreed to a number of commitments, *inter alia*, related to customer refunds. (Passeri Decl. ¶ 3; Passeri Decl. Ex. A). The Canadian Government provided Defendant with over CAD $5 billion through the Large Employer Emergency Financing Facility Program. (*Id*. Ex. A). Defendant immediately announced the Refund Offer, providing the option

---

[3] On June 15, 2021, the DOT filed its complaint and enforcement proceeding against Defendant as it had threatened for over one year. (Kravec Decl. Ex. G).

of a refund to all eligible customers globally who purchased a non-refundable fare but could not travel due to COVID-19. (*Id.* Ex. B). The Refund Offer was initially available to customers until June 12, 2021, and was later extended to July 12, 2021. (*Id.* ¶ 15).

On April 14, 2021, Defendant advised the Court of the commencement of the Refund Offer and set forth its position that the Refund Offer mooted Plaintiffs' claims on the grounds that the putative class is the same group of customers for whom Defendant was then offering a full refund. (Doc. 38). The Court did not make any determination concerning the alleged mootness of the claims, but, because of the changed circumstances and in light of its order consolidating *Piercy* and *Winograd* into *Vozzolo*, it directed the filing of a consolidated amended complaint. (Doc. 41).

Plaintiffs filed the instant motion for a preliminary injunction on June 29, 2021. (Doc. 55; Doc. 56 "Pl. Br."). On July 26, 2021, following a July 12, 2021 conference with the Court, Defendant filed opposition to the motion. (Doc. 63, "Def. Opp."). Plaintiffs' reply was filed on August 9, 2021. (Doc. 71, "Reply"). Plaintiffs, in their notice of motion, had also sought a determination as to whether their claims were mooted by the Refund Offer. (Doc. 55). After the motion was fully briefed, however, on August 27, 2021, Plaintiffs requested that the Court take any deadlines to file a consolidated amended complaint off the calendar because, based on their evaluation of information provided by Defendant, Plaintiffs believed the Refund Offer had mooted out the putative class members' claims. (*See* Doc. 76). The Court accepts both sides' position that Plaintiffs' claims have become moot as a result of the Refund Offer. Accordingly, the sole issue presently before the Court is whether Plaintiffs are entitled to a preliminary injunction directing Defendant to set aside a portion of any yet-to-be paid refunds for attorney's fees, pending a determination of whether Plaintiffs' suits were "a substantial cause" of the Refund Offer.

## STANDARD OF REVIEW

The general principle in the United States is that "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). A well-recognized exception exists in cases where a plaintiff creates a common fund for the benefit of others as well as himself. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970).

"[U]nder the common fund doctrine, where a plaintiff recovers a fund for the benefit of himself and others not involved in the suit, the plaintiff may recover attorney's fees from the fund itself or directly from the other parties enjoying the benefit." *Brautigam v. Bratt*, No. 98-CV-09060, 2000 WL 1264289, at *1 (S.D.N.Y. Sept. 5, 2000) (citing *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996)). "'Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained,' as by the defendant's voluntary provision of the relief." *Donoghue v. Astro Aerospace Ltd.*, No. 19-CV-07991, 2021 WL 1964294, at *2 (S.D.N.Y. May 17, 2021) (quoting *Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1996)). To recover attorney's fees in a suit that has become moot, "'the district court must determine whether [the] plaintiff's suit was a substantial cause of the benefit obtained,' or, in other words, whether the suit 'caused the [defendant] to make the [ ] reimbursement' the mooted claim sought as relief." *Id.* (quoting *Savoie*, 84 F.3d at 55-57) (alteration in original).

"[W]here a defendant intends to distribute the entirety of what is arguably a common fund, plaintiffs should seek a preliminary injunction to set aside a portion of the common fund, in order to ensure the availability of common fund monies pending a determination by a court as to whether

a fee award is warranted." *Savoie*, 84 F.3d at 58; *see also Brautigam*, 2000 WL 1264289, at *2 ("[I]f a common fund exists and the defendant intends to distribute the entirety of the fund to the benefitted class, the plaintiff should seek a preliminary injunction to set aside a portion of the common fund for a potential attorney's fee award."). The issue, at the preliminary injunction stage, is simply whether Plaintiffs have "met the preliminary injunction standard of demonstrating a reasonable probability of success on all elements of the claim for attorney's fees, including a causal relation between the lawsuit and the payment," but not the "[u]ltimate determination of the causation issue on its merits." *Savoie*, 84 F.3d at 60.

A party seeking a preliminary injunction, in the Second Circuit, generally must establish: "(1) the likelihood of irreparable injury in the absence of an order or injunction; (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation; and (3) a balance of hardships tipping decidedly in the movant's favor." *Int'l Bus. Machs. Corp. v. De Freitas Lima*, No. 20-CV-04573, 2020 WL 5261336, at *5 (S.D.N.Y. Sept. 3, 2020), *aff'd sub nom. Int'l Bus. Machs. Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021) (citing *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)).

A court may grant injunctive relief either when an applicant for a preliminary injunction establishes, *inter alia*, a likelihood of success on the merits, or when the applicant "has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). This flexible standard "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits [of its claim for attorney's fees], but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mrkts., Inc.*

*v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Under the "serious questions" standard, the movant must establish that the harm that it would suffer is "'decidedly' greater" than the harm his opponent would suffer. *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (quoting *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979)).

## **ANALYSIS**

### I.    The Existence of a Common Fund

Defendant argues that Plaintiffs are not entitled to the requested preliminary injunction because, *inter alia*, no "common fund" exists to provide refunds to eligible U.S. customers who purchased non-refundable fares from Air Canada but could not travel due to COVID-19. (Def. Opp. at 11). Because the financial aid package extended by the Canadian Government to Defendant "is the equivalent of a line of credit or a complex loan . . . that will be used by [Defendant] to better resolve customer refunds of non-refundable tickets," Defendant maintains that no determinate fund was set aside, and therefore no common fund exists. (*Id.*). Plaintiffs counter that the refunds themselves are the fund. (Reply at 3-4). The Court agrees.

As the Supreme Court has stated, courts have "applied [the common fund doctrine] in a wide range of circumstances as part of [their] inherent authority." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 104 (2013) (citing *Boeing Co.*, 444 U.S. at 478; *Hall v. Cole*, 412 U.S. 1, 6-7 and n.7 (1973); *Mills*, 396 U.S. at 389-90, 392; *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 166 (1939); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126-27 (1885); *Internal Imp. Fund Trs. v. Greenough*, 105 U.S. 527, 531-33 (1881)). Case law is clear that the court's equitable power to award fees is preserved even where a party does not formally establish a fund. *Sprague*, 307 U.S. at 167 ("[W]hen such a fund is for all practical purposes created for the benefit of others, the

formalities of the litigation— . . . the creation of a fund, as it were . . . —hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation."); *see also Chen v. Select Income REIT*, No. 18-CV-10418, 2019 WL 6139014, at *7 (S.D.N.Y. Oct. 11, 2019) ("The Second Circuit uses the term 'common fund doctrine' somewhat broadly so as to incorporate the 'common benefit' doctrine—the rule by which plaintiffs may seek recovery of costs, even where no 'fund' has been recovered, as long as it is possible to spread the burden of those costs proportionately among members of the class." (internal citations omitted)).

Defendant, in this case, identified its customers: (i) who held non-refundable or partially refundable tickets for travel to or from the United States, (ii) with a point of sale in the United States, and (iii) whose flights were cancelled from March 1, 2020 to present for any reason ("U.S. Eligible Customers"). Those customers were offered a refund, and there still exist U.S. Eligible Customers who paid for a cancelled flight and did not receive a refund, elect a travel voucher, or use a credit. (*See* Doc. 76). Like the reimbursements to trust customers for their losses in the total amount of $9 million in *Savoie*, the refunds here under the Refund Offer arguably constitute a fund under the common fund doctrine. 84 F.3d at 58.

The Court recognizes that the posture of this case is unique in light of the case law concerning attorney's fees in common fund cases. The complexities raised by the distinct circumstances at issue here, however, do not compel a different result—a benefit has been bestowed upon individuals who may have been members of the putative class, and there exists a pot from which those benefits are to be paid, earmarked for such purpose, which have not yet been paid. Thus, if Plaintiffs have met their burden on this motion (*i.e.*, a likelihood of irreparable injury in the absence of an injunction; and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of

hardships tipping decidedly in their favor), a *status quo* injunction is warranted prohibiting Defendant from disbursing refunds not yet paid to putative class members unless a portion of such refunds is placed in an escrow account pending the Court's final determination of whether Plaintiffs are entitled to an award of attorney's fees.[4]

II.   Irreparable Injury

Under the common fund doctrine, and should Plaintiffs ultimately prevail on their claim for attorney's fees, such fees could only be recovered from the common fund or persons who have derived benefit from the lawsuit, and not directly from Defendant. *Savoie*, 84 F.3d at 58; *Brautigam*, 2000 WL 1264289, at *1; *see also Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 212 (2d Cir. 1987) ("[T]he common fund doctrine does not apply to the instant action because appellants seek fees and costs from [defendant], not from any 'fund' or from those persons who purportedly have benefited from appellants' law suit."). In other words, the fees must be paid from the common fund created so that those who benefitted each pay their aliquot share. This rule exists "because a fee award against the [defendant] would not result in a pass-through of the costs to the [individuals] who benefitted, at least in part, from the lawsuit." *Savoie*, 84 F.3d at 58; *Christensen*, 815 F.2d at 211.

There is, unequivocally, irreparable injury here in the absence of the requested injunction. If Plaintiffs are subsequently awarded attorney's fees but a portion of the common fund was not

---

[4] Case law suggests there are exceptions to the general preliminary injunction standard and certain situations when the "serious questions" standard is not employed, such as when a mandatory, as opposed to prohibitory, injunction is sought. *See Citigroup Glob. Mrkts., Inc.*, 598 F.3d at 35, n.4 ("[A] mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo, should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." (internal citations and quotation marks omitted)). The case law is likewise clear that the "serious questions" standard applies when a Court is considering a *status quo* injunction, such as the case here. *See, e.g., Kickham Hanley P.C. v. Kodak Ret. Income Plan*, 558 F.3d 204, 209-10, 215 (2d Cir. 2009).

set aside prior to disbursement, Plaintiffs would have to attempt to seek recovery from each of the customers who already received a refund—a virtually impossible reality. The Second Circuit has recognized "that forcing counsel to attempt to collect its fee from hundreds of . . . customers individually 'is so impractical as to be infeasible, and constitutes irreparable harm.'" *Kickham Hanley P.C. v. Kodak Ret. Income Plan*, 558 F.3d 204, 209 (2d Cir. 2009) (quoting *Savoie*, 84 F.3d at 58).

Defendant argues that "[t]o the extent Plaintiffs' demand consists of U.S. customers who received a refund to pay back part or all of their refunds so that Plaintiffs can recover attorneys' fees, this demand is impracticable for the company, unfair to customers, and would undoubtedly yield more litigation." (Def. Opp. at 9). Defendant's concern is Plaintiffs' point precisely—the refunds that have already been disbursed are no longer a fund from which attorney's fees may be paid, and therefore, a portion of the yet-to-be paid refunds must be set aside so as to preserve a fund from which attorney's fees may be paid in the event Plaintiffs are successful on their claim for attorney's fees. Absent such an injunction, Plaintiffs would clearly be irreparably harmed.

III.    Likelihood of Success or Sufficiently Serious Questions

Plaintiffs, on this motion, also must demonstrate either a likelihood of success on the merits of their claim that they are entitled to an award of attorney's fees, or sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of the hardships tipping decidedly in their favor. To establish entitlement to attorney's fees in a suit that has become moot, the Court must find that Plaintiffs' suit was a "substantial cause" of the benefit obtained. *Brautigam*, 2000 WL 1264289, at *1 (citing *Savoie*, 84 F.3d at 56-57). When the defendant has taken action to moot the plaintiff's suit, the defendant bears the burden of establishing the absence of a causal connection. *Id.*; *Savoie*, 84 F.3d at 57; *Koppel*, 743 F.2d at 135. In other words, because

11

Defendant's Refund Offer mooted Plaintiffs' lawsuit as the parties have agreed, the burden of production and persuasion shifts to Defendant to establish the absence of a causal connection between the lawsuit and the Refund Offer in order to defeat a claim for legal fees. *Koppel*, 743 F.2d at 135. At this juncture, the Court must determine that the proof offered on this motion demonstrates that it is more likely than not that this litigation was a substantial cause of the Refund Offer, or that the proof raises serious questions as to whether it was a substantial cause so as to make those questions a fair ground for litigation.

Although the vast majority of the submitted proof is hearsay, hearsay evidence may be considered in determining whether to grant a preliminary injunction. *Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010). At this stage, the admissibility of hearsay "goes to weight, not preclusion." *Id*. at 52; *Zeneca Inc. v. Eli Lilly & Co.*, No. 99-CV-01452, 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999).

Plaintiffs offer documents which they contend show that their suits were a substantial cause of the Refund Offer, that the suits caused Defendant to extend the Refund Offer to U.S. customers, and that something other than the Canadian Government's financial aid package was the cause of the Refund Offer. (Kravec Decl. Exs. A-G). The source of these contentions is primarily statements made in Defendant's company analysis for the First Quarter 2020, statements made by Canadian Government officials, press releases, news articles, and papers submitted in the DOT's enforcement action against Defendant. Much of the proof amounts to commentary that by not offering refunds to passengers whose flights were cancelled as a result of COVID-19, the company would be exposed to litigation and enforcement action. Plaintiff also argues that its proof suggests that the Canadian Government's financial aid to Defendant was meant as aid for Canadian passengers and employees, and not U.S. passengers.

Defendant, in opposition, submits press releases, websites and news articles, information concerning lawsuits filed against Defendant, and the affidavit Kevin Strohmaier, Defendant's Senior Director, Revenue Management and Ancillary Revenues, stating that Plaintiffs' suits "had absolutely no bearing on Air Canada's decision." (Doc. 64 ¶ 2). This single, conclusory sentence offered by Defendant certainly does not establish the absence of a causal relationship between Plaintiffs' suits and the Refund Offer. The burden will be on Defendant at the hearing to establish the absence of a causal connection between the lawsuit and the Refund Offer; and at this juncture based upon the evidence before it, the Court views the proof as raising serious questions as to whether Plaintiffs' suits were a substantial cause of the Refund Offer. There appear to be myriad factors that contributed to the decision to begin the Refund Offer. As discussed above, before *Vozzolo* was filed, three putative class actions had already been commenced against Defendant in Canada seeking certification of classes including U.S. residents. Additionally, a putative class action had already been commenced in the United States. Before *Piercy* and *Winograd* were filed, more putative class actions were commenced, and the DOT was threatening enforcement action. Most significant to the Court is the timing of the financial package extended by the Canadian Government to Defendant—it is logical to believe that Defendant would provide the Refund Offer upon receipt of aid despite the existence of multiple lawsuits and administrative proceedings.

However, the Court is simply unable to determine with the requisite certainty whether Plaintiffs' suits specifically were a substantial cause of the Refund Offer. As the Second Circuit has noted, there is an intent element to this inquiry which cannot be fully adjudicated without a hearing. *See Koppel*, 743 F.2d at 135 ("The causal connection . . . ultimately turns on [the defendant's] state of mind. Though the inference of causation is strong, motive is normally a matter for determination by the finder of fact."). The Court is likewise unconvinced, on the showing by

Defendant so far, that the lawsuits were not a cause at all. Plaintiffs' motion and the proof submitted by the parties, however, raise substantially serious questions going to the merits of Plaintiffs' claim for attorney's fees.

IV.     Balance of the Hardships

The balance of the hardships tips decidedly in Plaintiffs' favor. Simply stated, in the event Plaintiffs are successful on their claim for attorney's fees, and a portion of the yet-to-be paid refunds are not set aside, the common fund may be fully disbursed and would no longer be a fund from which attorney's fees could be paid. Absent the requested injunction, for the same reasons discussed concerning irreparable harm, Plaintiffs would be without recourse against Defendant under a common fund theory. On the other hand, Defendant suggests that it may not be contractually permitted to reserve a portion of the refunds for attorney's fees, but it does not support that suggestion with any citation to evidence. (*See* Def. Opp. at 10 ("[Q]uery whether the Government funding could even be used to cover attorneys' fees in these circumstances; clearly, fees were certainly not what the Canadian Government intended when it earmarked those funds for passenger refunds.")). In any event, whether the source of the funds Defendant chose to use comes from a loan or not, Defendant has created a refund available to all affected passengers. Under the circumstances, Plaintiffs have met their burden to show that the costs outweigh the benefits of not granting the injunction.

V.      Amount of Escrow

Plaintiffs urge the Court to direct Defendant to place into escrow 30% of any yet-to-be-paid refunds. Defendant contends that the fee analysis should be determined using the lodestar method rather than a percentage, and that 30% is excessive and unreasonable under either analysis. In the Second Circuit, "where a class action results in a common-fund settlement for the benefit of

14

the class, the common-fund doctrine applies and permits a district court to use its discretion to award class counsel either an unenhanced lodestar fee or a fee calculated as a percentage of the settlement fund." *Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 72 (2d Cir. 2019). Even where the fee is calculated as a percentage of the fund, it is inappropriate to base an award solely on a percentage of the recovery. Other factors must also be considered. *Newmark v. RKO Gen., Inc.*, 332 F. Supp. 161, 163-64 (S.D.N.Y. 1971) (considering "1) the amount of the recovery; 2) the novelty and complexity of the legal issues; 3) the skill with which the services were performed, and the standing of [the attorney]; 4) the benefits to [plaintiff]; 5) the contingent nature of [the attorney's] employment; 6) the hours reasonably expended by [the attorney]").

In addition, the percentage of the common fund awarded should be decreased as the size of the fund increases. The rationale for a sliding scale is that an increased amount of recovery does not require correspondingly increased levels of effort by the attorneys, and it "is appropriate in order to avoid overcompensating plaintiffs' counsel to the detriment of the class members they represent." *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017); *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 134 (2d Cir. 2014) ("When considering common fund or class action law suits, we have recognized that '[district] courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable' given the 'economies of scale[.]'") (quoting *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005)).

Indeed, in *Savoie*, upon which Plaintiffs rely heavily, the Second Circuit affirmed an amount equal to a 5.5% set-aside for a possible award of attorney's fees. 84 F.3d at 60 (affirming order directing defendant to escrow $500,000 of the $9 million distribution). Upon remand and

following a hearing on causation and attorney's fees, the District Court employed the lodestar method and awarded fees in the amount of $98,605.62, which was then affirmed by the Second Circuit. *See Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999). The Court takes guidance from *Savoie* in determining the amount of the escrow to direct in this case, and directs that of the yet-to-be-paid refunds as of August 12, 2021 in the amount of CAD $⬛⬛⬛ (or USD $⬛⬛⬛), Defendant place in escrow 5%, which amounts to CAD $⬛⬛⬛ (or USD $⬛⬛⬛),[5] pending the Court's final determination of whether Plaintiffs are entitled to an award of attorney's fees. Should Plaintiffs ultimately prevail following a hearing on causation, whether the Court employs a lodestar analysis or a percentage of the common fund to award attorney's fees, to the extent the Court awards less than the total set aside, Defendant will be able to distribute the remainder of the set aside to putative class members.

## CONCLUSION

Based on the foregoing, the Court finds that Plaintiffs have demonstrated that irreparable harm will follow if a preliminary injunction is not granted, as well as substantial questions going to the merits of their claim for attorney's fees, and a balance of hardships tipping decidedly in their favor. Accordingly, the Court GRANTS Plaintiffs' motion for a preliminary injunction (Doc. 55) as follows: Defendant is enjoined from disbursing refunds not yet paid to putative class members as of August 12, 2021, unless 5% of such refunds is placed in an escrow account pending the Court's final determination of whether Plaintiffs are entitled to an award of attorney's fees.

---

[5] The Court recognizes that Defendant's obligation to maintain the common fund and not disburse refunds from that fund is triggered once it is on notice of the injunction proceeding and Plaintiffs' potential right to attorney's fees to be paid from the yet-to-be-paid refunds. *See Savoie*, 84 F. 3d at 58-59. Although Plaintiff's motion was filed on June 29, 2021, the Court directs that the 5% be calculated based upon the total amount stated in Defendant's August 12, 2021 letter appended to Plaintiffs' August 27, 2021 letter (Docs. 76, 77) for ease and clarity and as a matter of administrative convenience to the parties. Because those letters were filed under seal, the Court's Memorandum Opinion and Order will be filed under seal and a redacted version will be filed publicly.

16

The Court dispenses with the filing of a bond.[6]

A hearing has been scheduled on the issue of causation on January 11, 2022 at 11:30 a.m. at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, 300 Quarropas Street, White Plains, New York 10601. The Court will advise the parties of the courtroom before the appearance date. All members of the public, including attorneys, appearing at a Southern District of New York courthouse must complete a questionnaire and have their temperature taken before being allowed entry into that courthouse. On the day that you are due to arrive at the courthouse, click on the following weblink: https://app.certify.me/SDNYPublic. Follow the instructions and fill out the questionnaire. If your answers meet the requirements for entry, you will be sent a QR code to be used as the SDNY entry device at the courthouse entrance.

The parties may engage in discovery as to the causation issue and shall file pre-hearing memoranda, limited to 15 double-spaced pages, concerning causation and Plaintiffs' entitlement to attorney's fees by January 4, 2022. The causation hearing will not be adjourned because discovery concerning causation has not been completed.

**SO ORDERED:**

Dated:  White Plains, New York
            November 3, 2021

_____
Philip M. Halpern
United States District Judge

---

[6] District courts are vested with wide discretion in the matter of posting security. *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). No request for a bond has been made in this case, and neither party addressed the issue of a bond in the course of the preliminary injunction motion practice. The Court finds it unnecessary to require Plaintiffs to execute a bond under these circumstances. *See Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("Because no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, the amount of any given bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond.").